

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| DARRELL UNDERWOOD, Petitioner, v. UNITED STATES OF AMERICA. | Criminal Action No. 3:08-CR-524<br>Civil Action No. 3:10-CV-784 |
|---|---|

| CYNTHIA UNDERWOOD, Petitioner, v. UNITED STATES OF AMERICA. | Criminal Action No. 3:08-CR-524<br>Civil Action No. 3:10-CV-785 |
|---|---|

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Motions to Vacate, Correct or Set Aside Sentence Pursuant to 28 U.S.C. § 2255 filed by *pro se* Petitioners Darrell Underwood and Cynthia Underwood ("§ 2255 Motions") (ECF Nos. 114 and 115), as well as a Joint Motion for Evidentiary Hearing filed by Petitioners (ECF No. 153). In their motions, Petitioners seek collateral review of their 2009 convictions for operation of a Ponzi scheme. For the reasons stated below, the Court DENIES Darrell and Cynthia Underwood's § 2255 Motions. The Motion for Evidentiary Hearing is also DENIED and the Court DENIES a Certificate of Appealability for both petitions.

### I. FACTUAL AND PROCEDURAL HISTORY

Petitioner Darrell Underwood was convicted pursuant to a guilty plea of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 371, and Engaging in Unlawful Monetary Transactions, in violation of 18 U.S.C. § 1957(a). Petitioner Cynthia Underwood was convicted

pursuant to a guilty plea of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 371. Petitioners convictions arise out of their roles in orchestrating a Ponzi scheme they operated between 2007 and 2009.

Darrell Underwood, aided and assisted by Cynthia Underwood, solicited investors for a real estate venture, convincing investors to invest in Walkwood Properties ("Walkwood") by telling them the company would invest the money in properties subject to foreclosure. Petitioners promised investors a 50 percent return on the investment within a 60-to-120 day period. Throughout 2007 and into early 2008, investors received payments, leading them to believe the housing transactions were generating the promised returns on the investments. Evidence introduced at trial, however, established Petitioners were using investors' funds to pay other investors and for Petitioners' own enrichment.

Petitioners proceeded to trial in June 2009. Trial evidence established Petitioners used most of the investment funds to repay other investors, instead of investing in homes. Between April and December 2007, Petitioners received approximately $18,400,000 in investor funds. Bank records established that only $2,100,000 was actually used for real estate transactions. During the same period, Petitioners paid approximately $16,200,000 to investors. Of that amount, $13,400,000 was derived from investor funds. Petitioners used investor funds to cover their personal expenses, including mortgage payments, a boat purchase, payments on multiple automobile loans, and tithes to their church. Overall, Petitioners only participated in about thirty real estate transactions over the course of the scheme.

As of December 13, 2007, the date the investment accounts were seized in connection with the investigation of Petitioners' business, the investor account had a balance of $780,557.07. Petitioners' investment program had an outstanding balance of more than $14,000,000. Over $9,700,000 of the outstanding balance comprised of principal balances owed. Prior to trial, the Underwoods were restrained by a Pretrial Restraining Order from managing or disposing of assets, up to the amount of $14,000,000.

Both Petitioners pled guilty before their trial concluded. In the plea agreements, both Petitioners agreed that the total amount of loss resulting from their scheme was $9,738,997.67. Darrell Underwood's plea agreement included an agreement and Government recommendation that the Court not sentence him to more than ten years imprisonment, under Federal Rule of Criminal Procedure 11(c)(1)(C). Because Cynthia Underwood pled guilty to conspiracy, her sentencing range was capped at the statutory maximum 60 months imprisonment. This Court sentenced Darrell Underwood to 120 months and Cynthia Underwood to 36 months imprisoment. Petitioners did not appeal their convictions or sentences because waiver of the right to appeal was a part of the defendants' plea agreements.

Petitioners now assert their sentences should be vacated under 28 U.S.C. § 2255. The Underwoods raise three grounds for relief:

1. Counsel violated defendants' right to effective assistance of counsel during the plea/trial phase by failing to conduct a reasonable investigation and perform due diligence, so as to properly assess, evaluate, and calculate the fair market value of Walkwood Properties before counseling defendants to stipulate to an "Actual Loss" amount of $9,738,997.67 to be used in calculating the offense level at sentencing.

2. Counsel violated defendants' right to effective assistance of counsel by stipulating to an "Actual Loss" amount of $9,738.997.67 and failing to object to the calculation of the defendants' guideline range based on that amount.

3. Counsel violated defendants' right to effective assistance of counsel during the restitution phase by failing to object to the Final Report as to Restitution filed by the Government and the Restitution Judgment entered by the Court.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in federal custody may attack his sentence on four grounds: (1) the sentence violates the Constitution or the laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *see also Hill v. United States*, 368 U.S. 424, 426–27 (1962). A claim which does not challenge the constitutionality of a sentence or the court's jurisdiction is cognizable in a § 2255 motion only if the alleged violation constitutes a "miscarriage of justice." *United States v. Addonizio*, 442 U.S.

3

178, 185 (1979). To prevail under § 2255, the movant bears the burden of proof by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958); *United States v. King*, 36 F. Supp. 2d 705, 707 (E.D. Va. 1999). A *pro se* petitioner is held to a less exacting standard than an attorney in drafting his petition. *Gordon v. Leeke*, 574 F.2d 1147 (4th Cir. 1978). Therefore, the Court generously interprets the Underwoods' factual allegations and legal contentions.

Ineffective assistance of counsel claims under the Sixth Amendment are examined under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on an ineffective assistance claim, a petitioner must show: (1) his attorney's performance fell below and objective standard of reasonableness, and (2) he suffered actual prejudice. *Id.* There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. A court must consider "the practical limitations and tactical decisions that counsel faced" when making an ineffective assistance of counsel determination. *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991).

To satisfy the first prong of the *Strickland* test, the petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' measured by 'prevailing professional norms.'" *Lewis v. Wheeler*, 609 F.3d 291, 301 (4th Cir. 2010) (quoting *Strickland*, 466 U.S. at 688). When evaluating decisions regarding case investigation, the court must "regard counsel's choices with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). To satisfy the prejudice requirement, the petitioner must show that counsel's errors were serious enough to deprive the petitioner of a fair trial. *Strickland*, 466 U.S. at 687. In other words, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If it is clear the

petitioner has not satisfied one prong of the *Strickland* standard, a court need not inquire into whether he satisfied the other. *Id.* at 697.

A petitioner who alleges ineffective assistance of counsel following entry of a guilty plea must satisfy the *Strickland* standard. *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985). When a petitioner challenges a conviction after a guilty plea, the "the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012) (quoting *Hill*, 474 U.S. at 59). In order "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 486 (2000)). Where the petitioner alleges counsel's error is a failure to investigate prior to entry of a guilty plea, "the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill*, 474 U.S. at 59. Such a determination "depend[s] in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.*

### III. DISCUSSION

**1. Claims 1 and 2: Counsel Rendered Ineffective Assistance Because They did not Properly Calculate Fair Market Value of the Walkwood's Assets Before Counseling Petitioners to Stipulate to the Loss Amount and did not Object to the Loss Amount at Sentencing**

Petitioners' first two claims argue their sentences are invalid and must be vacated because counsel failed to ascertain the correct loss amount to be used in calculating their sentencing guidelines and failed to object to the loss amount at their sentencing hearing. These claims fail. It is well-settled that the loss amount for purposes of calculating sentencing guidelines is the greater of intended loss or actual loss. U.S.S.G. § 2B1.1 cmt. n.3(A) (2008); *see also United States v. McDowell*, 388 Fed. App'x 283, 284 (4th Cir. 2010); *United States v.*

*Loayza*, 107 F.3d 257, 265 (4th Cir. 1997). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). Intended loss is "the pecuniary harm that was intended to result from the offense; and [] includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). The intended loss is the amount put at risk by the defendant's actions. *United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998). The Seventh Circuit provides an apposite description of the calculation of intended loss:

> Even if actual and intended losses could not be added in a case such as this, Lauer's appeal would fail. He says he didn't intend the loss of the entire $ 19.9 million, and there is a sense in which this is true. But it is the same sense in which the author of a Ponzi scheme might not intend that any of his investors lose anything--might intend that the scheme continue until the end of the world, in which event there would be no losers. Likewise an embezzler might not intend to impose a loss on his employer, might instead intend to use the money to gamble and win and thus be able to replace every penny he had taken. Suppose that he is caught before he has a chance to gamble with any of the money, and every cent is recovered. He is nevertheless an embezzler to the full extent of the amount he took, no matter how golden his intentions or happy the consequences.
>
> We may put it this way: the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victim from harm is both impossible to verify and peripheral to the danger that the crime poses to the community.

*Id.* at 767–68 (internal quotation marks and citations omitted).

The loss figure used in the Underwoods' case for sentencing purposes was the intended loss amount. The intended loss figure associated with Petitioners' Ponzi scheme was based on the outstanding principal amount owed investors at the time the Government seized Walkwood's investment accounts. Internal Revenue Service Special Agent Brian Le Fevre stated in an affidavit:

> At trial the government was prepared to introduce, through my testimony and other evidence, that had WALKWOOD ceased operations on the date of the search warrants executed at both WALKWOOD and the UNDERWOOD's residence in December 2007, victims of the UNDERWOOD's Ponzi scheme would have been owed $9,738,997.67. This figure was calculated based on a

> summary of investment contracts seized by the government, which promised a 50% rate of return and were due to mature after the execution of the warrants... . Even though the investment contracts promised a 50% rate of return, the $9,738,997.67 was solely based on the principal amount of funds invested in the Ponzi scheme, not based upon the projected yields. This loss calculation was corroborated through the analysis of financial transactions and through the testimony of multiple victim witnesses.

Gov't Opp'n Ex. A, ¶5.

Petitioners make no claim the principal balances owed to their investors was less than $9,738,997.67. Rather Petitioners' claim they actually intended that all investors be paid back according to their investment contracts resulting in an intended loss of $0 or that the loss amount should have been decreased by the fair market value of Walkwood's assets. This argument misinterprets the meaning of "intended loss." That Petitioners hoped to maintain their scheme indefinitely in order to pay off their contracts or had assets that could have been used to pay investors is irrelevant. The proper calculation of intended loss is the amount of money put at risk by the petitioners, which is the amount invested in their scheme. The intended loss is therefore at least the principal balance outstanding at the time the Government seized the investment accounts in connection with the investigation—$9,738,997.67. *See Loayza*, 107 F.3d at 265–66 (holding intended loss includes "the value of all property taken, even though all or part is returned").

Petitioners' argument that the loss amount should have been the same as the final restitution figure ($6,678,479.74) also fails. An order of restitution must be based on actual loss rather than intended loss. *United States v.* Harvey, 532 F.3d 326, 339 (4th Cir. 2008). Because the intended loss was greater than the actual loss used for restitution purposes, it was the proper amount to use at sentencing. *See* U.S.S.G. § 2B1.1 cmt. n.3(A). However, even if the restitution amount was used as the base for the calculation of the intended loss, it would make no difference. The restitution amount consisted of the amounts directly verifiable with the investors and was decreased by $567,124.50 based on returns received by the investors during the course of the scheme. Intended loses include all amounts invested, and therefore the returns deducted

from the restitution amount would be added back in to calculate the intended loss. The result would be an intended loss of $7,245,604.24, which falls within the same sentencing guideline range as Petitioners' original sentencing guidelines.

Petitioners' reliance on Application Note 3(E)(ii) to U.S.S.G § 2B1.1 and *United States v. Goss*, 549 F.3d 1013 (5th Cir. 2008), is also unpersuasive. The Application Note provides that:

> In a case involving collateral pledged or otherwise provided by the defendant, [the loss amount shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, cmt. n.3(E)(ii). *Goss* holds that where a defendant was convicted of mortgage fraud, the appropriate loss calculation was the actual loss, taking into account the fair market value of collateral pledged by the defendant to the victim. 549 F.3d at 1017, 1019. Petitioners' reliance on the Application Note and *Goss* is misplaced because they did not pledge collateral to secure their investments. *See United States v. Shuster*, 361 Fed. App'x 208, 211 (2d Cir. 2010) ("Application Note 3(E)(ii) to U.S.S.G. § 2B1.1 does not apply in this case. That Application Note applies only to an offense 'involving collateral pledged or otherwise provided by the defendant.' We are unaware of any precedent for treating the kind of investment fraud that appellant was involved in—essentially a Ponzi scheme—as a fraud involving 'collateral pledged or otherwise provided.'"). The investors in this case provided *unsecured* investments to Walkwood, which happened to have real estate holdings. This case therefore does not fall under the prevue of Application Note 3(E)(ii) or *Goss*.

Petitioners arguments that an intended loss of $9,738,997.67 was incorrectly used at sentencing therefore fails. Because the higher amount of intended or actual loss is used in the sentencing calculations, any investigation that could have been conducted by trial counsel reducing the amount of the actual loss is irrelevant. Counsel, therefore, was not deficient in deciding not to investigate the fair market value of Walkwood's assets in an attempt to reduce the actual loss amount assigned to Petitioners' case. Petitioners' trial counsel was not deficient

in their performance, and therefore, provided constitutionally adequate assistance of counsel, ending the Court's inquiry. Accordingly, the Court DENIES Claims One and Two.

### 2. Claim 3: Counsel Rendered Ineffective Assistance by Failing to Object to the Government's Final Restitution Report and to the Restitution Judgment Entered by the Court

Petitioners' third claim asserts they received ineffective assistance of counsel because trial counsel did not object to the restitution amount, which they allege did not take into account the fair market value of their property holdings. Restitution orders are generally not cognizable on collateral review. *United States v. Runnells*, 36 F. Supp. 2d 696, 700 (E.D. Va. 1998) ("Quite simply, a restitution order, absent substantial justification, is not the proper subject of a § 2255 petition and may not be collaterally attacked."); *see also United States v. Adams*, No. 4:08cr033, 2012 WL 5465887 at *7 (W.D. Va. June 25, 2012) (holding the court lacked jurisdiction to set aside a judgment on a claim of ineffective assistance of counsel about the validity of a forfeiture order). A majority of circuit courts hold restitution claims are not cognizable on collateral review under § 2255 because restitution orders do not meet the provision's "in custody" requirement. *See, e.g., Kaminski v. United States*, 339 F.3d 84, 87 (2d Cir. 2003); *United States v. Hatten*, 167 F.3d 884, 887 (5th Cir. 1999); *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997); *Smullen v. United States*, 94 F.3d 20, 26 (1st Cir. 1996). *But see Weinberger v. United States*, 268 F.3d 346, 351 n.1 (6th Cir. 2001) (holding a claim for ineffective assistance of counsel regarding restitution is cognizable under 28 U.S.C. § 2255).

Petitioners frame their claim as one for ineffective assistance of counsel and to the extent their claim is cognizable on collateral review it, too, must fail. Petitioners argue counsel should have objected to the restitution amount because it did not take into account the equity, based on the fair market value, in Walkwood's assets. Petitioners also assert counsel failed to ensure they received credit for the $1.2 million in cash seized by the government. This argument fails because the Restitution Judgment states "[a]ny disbursements made to any victim in connection

9

with this case shall be credited against the amount of loss owed as restitution." Gov't Opp'n Ex. D ¶ 4. Accordingly, the value of any property seized in this case and used to pay the victims will serve to reduce the restitution amount and any objection by counsel would have been futile. Petitioners therefore fail to prove deficiency or prejudice and Claim Three is DENIED.

## IV. MOTION FOR AN EVIDENTIARY HEARING

Generally, an evidentiary hearing is required under § 2255 unless it is clear from the pleadings, files, and records that a movant is not entitled to relief. *United States v. Witherspoon*, 231 F.3d 923, 925–27 (4th Cir. 2000); *Raines v. United States*, 423 F.2d 526, 529–30 (4th Cir. 1970). The district court must hold an evidentiary hearing when the movant "presents a colorable . . . claim showing disputed facts beyond the record and a credibility determination is necessary in order to resolve the issue." *Witherspoon*, 231 F.3d at 925–27. Whether an evidentiary hearing is necessary is within the discretion of the district court. *Raines*, 423 F.2d at 530.

Petitioners seek an evidentiary hearing in order to "correctly and accurately set forth the calculation of the loss for which the Petitioners are responsible." Mot. Evid. Hrg. 2. The calculation of the intended loss, based on the outstanding principal balances on the date the Government seized Walkwood's accounts, was accurate for sentencing purposes. Petitioners do not contest the calculation of the outstanding principal balances, only the amount of the actual loss. As discussed more fully above, the calculation of the actual loss is irrelevant to the sentencing calculation as the higher of the intended or actual loss provides the basis for the guideline calculations. Accordingly, a hearing on the amount of the actual loss would not alter the Court's conclusions. It is therefore clear from the pleadings, file, and record that Petitioners are not entitled to relief and the Motion for Evidentiary Hearing is DENIED.

## V. CERTIFICATE OF APPEALABILITY

A district court that enters a final order denying a § 2255 motion must grant or deny a certificate of appealability. Rule 11(a) of the Rules Governing Section 2255 Proceedings. A

certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Miller-El*, 537 U.S. at 336–38 (citing *Slack*, 529 U.S. at 484). For the reasons stated more fully above, no law or evidence suggests Petitioners are entitled to further consideration of their claims. Accordingly, the Court DENIES a certificate of appealability.

## VI. CONCLUSION

For the reasons stated above, the Court DENIES Petitioners' § 2255 Motions and the Motion for Evidentiary Hearing. The Court also DENIES a Certificate of Appealability.

Let the Clerk send a copy of this Memorandum Opinion to Petitioners and all counsel of record.

An appropriate order shall issue.

/s/
James R. Spencer
United States District Judge

ENTERED this 6th day of December, 2012.